**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

CHAMBER OF COMMERCE OF      *
THE UNITED STATES OF AMERICA
1615 H Street, NW      *
Washington, DC 20062;

     *

ASSOCIATED BUILDERS      *
AND CONTRACTORS, INC.      *
4250 N. Fairfax Drive, 9th Floor
Arlington, VA 22203;      *

SOCIETY FOR HUMAN      *
RESOURCE MANAGEMENT
1800 Duke Street      *
Alexandria, VA 22314;

     *

AMERICAN COUNCIL ON
INTERNATIONAL PERSONNEL      *
1101 15th Street, NW, Suite 750
Washington, DC 20005; and      *

HR POLICY ASSOCIATION      *
1100 13th Street, NW, Suite 850
Washington, DC 20005;      *

             Plaintiffs,      *

     vs.      *

MICHAEL CHERTOFF      *
*In his official capacity as*
*Secretary of Homeland Security*      *
Department of Homeland Security
245 Murray Drive, SW      *
Washington, DC 20528;

     *

ALBERT A. MATERA      *
*In his official capacity as Chairman*
*of the Civilian Agency Acquisition Council*      *
1800 F Street, NW      *
Washington, DC 20405; and

UNITED STATES OF AMERICA;               *

        Defendants.               *

        *    *    *    *    *

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Chamber of Commerce of the United States of America; Associated Builders and Contractors, Inc.; Society for Human Resource Management; American Council on International Personnel; and HR Policy Association (collectively, "Plaintiffs") file this Complaint for Declaratory and Injunctive Relief against Defendants Michael Chertoff, Secretary of Homeland Security; Albert A. Matera, Chairman of the Civilian Agency Acquisition Council; and the United States of America (collectively, "Defendants"), in support of which Plaintiffs allege as follows:

### PRELIMINARY STATEMENT

1.      "The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" *Medellin v. Texas*, 128 S. Ct. 1346, 1368 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer (Steel Seizure)*, 343 U.S. 579, 585 (1951)).

2.      The instant action seeks to enforce this fundamental principle of constitutional law following the recent promulgation of regulations pursuant to an Executive Order, the requirements of which violate the unambiguous command of Congress that no person or entity be compelled to participate in a particular federal program created by Congress, funded by Congress and controlled by Congress.

3.      The program in question is commonly known as "E-Verify," which is an Internet-based system that allows employers to verify electronically that newly hired employees are authorized to work

2

in the United States.  E-Verify is operated by the United States Citizenship and Immigration Services within the Department of Homeland Security, in partnership with the Social Security Administration.

4.      Congress authorized the creation of E-Verify by enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, tit. IV, subtit. A, 110 Stat. 3009-546, 3009-655 (codified as amended at 8 U.S.C. § 1324a note).  As amended, IIRIRA instructs the Secretary of Homeland Security that he is to conduct various "pilot programs of employment eligibility confirmation."  IIRIRA § 401(a).  E-Verify is one such "pilot program" and participation in any such pilot program is limited to employment verification of new hires.  *See* IIRIRA §§ 402(c)(2)(A), 403(a).

5.      Of particular importance to this case, IIRIRA expressly provides that "any person or other entity that conducts any hiring (or recruitment or referral) in a State in which a pilot program is operating may elect to participate in that pilot program.  Except as specifically provided in subsection (e) [referring to the required use of E-Verify by federal agencies, the Legislative Branch and certain immigration law violators], the Secretary of Homeland Security may not require any person or other entity to participate in a pilot program."  IIRIRA § 402(a).

6.      On November 14, 2008, however, Defendants promulgated regulations that purport to require certain government contractors and subcontractors to participate in E-Verify.  These regulations, which go into effect on January 15, 2009, "require certain contractors and subcontractors to use the E-Verify system . . . as the means of verifying that certain of their employees are eligible to work in the United States."  73 Fed. Reg. 67,651 (Nov. 14, 2008).  Covered contractors and subcontractors must use E-Verify to confirm the employment eligibility of all new hires, regardless of whether the person being hired is assigned to a federal contract or subcontract.  The regulations in question also require that cov-

3

ered contractors and subcontractors use E-Verify to electronically "reverify" the employment eligibility of existing employees hired after November 6, 1986, who are assigned to covered contracts and subcontracts.

7.      The requirements imposed by the Executive Order and regulations at issue in this case are illegal and must be set aside because, among other things, they violate IIRIRA's express statutory prohibition against requiring "any person or other entity to participate in a pilot program" such as E-Verify.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action and the parties thereto pursuant to 28 U.S.C. § 1331.

9.      The relief requested is authorized by 5 U.S.C. § 702 (Administrative Procedure Act); 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. § 2201 (Declaratory Judgment Act); and 28 U.S.C. § 2202 (further relief).  Plaintiffs have a right to bring this action pursuant to (1) the judicial-review provision of the Administrative Procedure Act, 5 U.S.C. § 702; and (2) the implied nonstatutory review procedure provided by 28 U.S.C. § 1331.

10.     Venue lies in this district under 28 U.S.C. § 1391(e).

## PARTIES

11.     Plaintiff Chamber of Commerce of the United States of America ("Chamber") is a non-profit corporation incorporated under the laws of the District of Columbia.  The Chamber is the world's largest business federation, representing an underlying membership of over three million businesses and organizations of every size and in every industry sector and geographical region of the United States. Among other things, the Chamber advocates for business and free enterprise before Congress, the White House, regulatory agencies and the courts.  Included within the Chamber's membership are a significant

number of businesses that will be required to comply with the regulations at issue in this case absent timely judicial relief.  Many of these member-businesses have already been forced to dedicate significant resources to prepare for this eventuality.  At least one such member-business does business in this district.  The Chamber's business address is 1615 H Street, NW, Washington, District of Columbia 20062.

12.     Plaintiff Associated Builders and Contractors, Inc. ("ABC") is a non-profit corporation incorporated under the laws of Maryland.  ABC is a national association representing over 25,000 construction and construction-related firms in 79 chapters across the United States.  ABC's membership represents all specialties within the United States construction industry and is comprised primarily of firms that perform work in the industrial and commercial sectors of the construction industry.  ABC's activities include government representation, legal advocacy, education and workforce development.  Included within ABC's membership are a significant number of businesses that will be required to comply with the regulations at issue in this case absent timely judicial relief.  Many of these member-businesses have already been forced to dedicate significant resources to prepare for this eventuality.  At least one such member-business does business in this district.  ABC's business address is 4250 North Fairfax Drive, 9th Floor, Arlington, Virginia 22203.

13.     Plaintiff Society for Human Resource Management ("SHRM") is a non-profit corporation incorporated under the laws of Ohio.  The world's largest professional association devoted to human resource management, SHRM's mission is to serve the needs of human resource professionals by providing the most current and comprehensive resources, and to advance the profession by promoting human resources' essential, strategic role.  Founded in 1948, SHRM represents more than 250,000 individual members in over 125 countries, and has a network of more than 575 affiliated chapters in the United

States.  Included within SHRM's membership are a significant number of human resource professionals who will be required to comply with the regulations at issue in this case absent timely judicial relief.  At least one member does business in this district.  SHRM's business address is 1800 Duke Street, Alexandria, Virginia 22314.

14.     Plaintiff American Council on International Personnel ("ACIP") is a non-profit corporation incorporated under the laws of the District of Columbia.  ACIP is an organization comprised of approximately 200 corporate and institutional members with an interest in the movement of personnel across national borders.  Each of ACIP's members employs at least 500 employees worldwide, and in total, ACIP members employ millions of United States citizens and foreign nationals in all industries throughout the United States.  Among other things, ACIP sponsors seminars and produces publications aimed at educating human resource and legal professionals on compliance with immigration and employment verification laws, while working with Congress and the Executive Branch to facilitate the movement of international personnel.  Included within ACIP's membership are a significant number of businesses that will be required to comply with the regulations at issue in this case absent timely judicial relief.  Many of these member-businesses have already been forced to dedicate significant resources to prepare for this eventuality.  At least one such member does business in this district.  ACIP's business address is 1101 15th Street, NW, Suite 750, Washington, District of Columbia 20005.

15.     Plaintiff HR Policy Association is a non-profit corporation incorporated under the laws of the District of Columbia.  HR Policy Association represents the senior human resource executives of over 240 leading employers doing business in the United States.  Collectively, HR Policy Association's members employ over 12 percent of the United States private sector workforce or some 19 million Americans.  Included within HR Policy Association's membership are a significant number of senior

human resource executives who will be required to comply with the regulations at issue in this case absent timely judicial relief.  Many of these senior human resource executives have already been forced to dedicate significant resources to prepare for this eventuality.  At least one such member does business in this district.  HR Policy Association's business address is 1100 13th Street, NW, Suite 850, Washington, District of Columbia 20005.

16.     Plaintiffs have standing to pursue this action on behalf of their respective members under the three-element test enunciated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because (1) Plaintiffs' members would otherwise have standing to sue in their own right, (2) the interests at stake in this case are germane to Plaintiffs' organizational purposes, and (3) neither the claims asserted nor the relief requested requires the participation of Plaintiffs' individual members.

17.     Defendant Michael Chertoff is the Secretary of Homeland Security ("Secretary").  The Secretary is the head of the Department of Homeland Security and, pursuant to 6 U.S.C. § 112(a)(2), "shall have direction, authority, and control over it."  Federal law provides that the Secretary "shall be charged with the administration and enforcement of this chapter [referring to Chapter 12, Title 8 of the United States Code, entitled "Immigration and Nationality"] and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers . . . ."  8 U.S.C. § 1103(a)(1).  The Secretary's business address is 245 Murray Drive, SW, Washington, District of Columbia 20528.  The Secretary is sued in his official capacity only.

18.     Defendant Albert A. Matera is the Chairman of the Civilian Agency Acquisition Council, which is an "agency" within the meaning of 5 U.S.C. § 701(b)(1).  Mr. Matera signed the proposed and final rules at issue in this case.  Mr. Matera's business address is 1800 F Street, NW, Washington, District of Columbia 20405.  Mr. Matera is sued in his official capacity only.

19.     Defendant United States of America is the sovereign government established by the Constitution of the United States.  Because this action is one "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority," 5 U.S.C. § 702 authorizes the United States of America to be named as a party defendant.

## FACTUAL ALLEGATIONS

### Congressional Regulation of Immigration Generally

20.     Enacted in 1952 and amended on various occasions thereafter, the Immigration and Nationality Act provides a comprehensive scheme for the regulation of immigration into the United States.  *See* Immigration and Nationality Act, ch. 477, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. §§ 1101-1537).

21.     In 1986, Congress amended the Immigration and Nationality Act to prohibit the hiring or continued employment of aliens when employers know that the aliens are unauthorized to work in the United States.   *See* Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, § 101(a)(1), 100 Stat. 3359, 3360 (codified as amended at 8 U.S.C. § 1324a(a)).

22.     To ensure compliance with this new statutory prohibition, Congress established a document-based system for employers to verify that individuals are authorized to work in the United States.  *See* IRCA § 101(a)(1), 100 Stat. at 3361 (codified as amended at 8 U.S.C. § 1324a(b)).  Pursuant to that

system, employers and employees must complete a form known as the Form I-9.  *See* United States Citizenship and Immigration Services, *Form I-9, Employment Eligibility Verification*, available at http://www.uscis.gov/files/form/I-9.pdf.  The Form I-9 is not filed with any federal agency.  Instead, it must be retained by the employer and made available for inspection by federal officials.  Employers must retain completed Forms I-9 for three years after the date of hire or one year after the date employment ends, whichever is later.

23.     At the same time that it created the document-based system for employers to verify that individuals are authorized to work in the United States, Congress directed the President to evaluate the document-based system's security and efficacy and to implement necessary changes, subject to strict congressional oversight.  *See* IRCA § 101(a)(1), 100 Stat. at 3363 (codified as amended at 8 U.S.C. § 1324a(d)).

24.     In relevant part, federal law provides that "[a]ny change the President proposes to implement . . . in the verification system must be designed in a manner so the verification system, as so changed, meets" certain enumerated requirements, including maintaining privacy of information.  8 U.S.C. § 1324a(d)(2).   "No major change may be implemented unless the Congress specifically provides, in an appropriations or other Act, for funds for implementation of the change." § 1324a(d)(3)(C)(ii).

25.     Congress placed strict limits on the President's ability to implement changes to the document-based system, requiring notice to Congress and congressional approval before the President could implement certain changes.  *See* 8 U.S.C. § 1324a(d)(3).  Among other things, federal law provides that "[t]he President may not implement any change [to the document-based system] unless at least . . . two years, in the case of a major change described in clause (i) or (ii) of subparagraph (D), be-

fore the date of implementation of the change, the President has prepared and transmitted to the Committee on the Judiciary of the House of Representatives and to the Committee on the Judiciary of the Senate a written report setting forth the proposed change." *Id.* A "major change described in clause (i) or (ii) of subparagraph (D)" includes a change that would "provide for a telephone verification system under which an employer, recruiter, or referrer must transmit to a Federal official information concerning the immigration status of prospective employees and the official transmits to the person, and the person must record, a verification code." § 1324a(d)(3)(D)(ii).

26.    In 1996, Congress authorized the creation of E-Verify by enacting IIRIRA. As amended, IIRIRA instructs the Secretary of Homeland Security that he is to conduct various "pilot programs of employment eligibility confirmation." IIRIRA § 401(a). E-Verify is one such "pilot program" and participation in any such pilot program is limited to employment verification of new hires. *See* IIRIRA §§ 402(c)(2)(A), 403(a).

27.    IIRIRA instructs that "any person or other entity that conducts any hiring (or recruitment or referral) in a State in which a pilot program is operating may elect to participate in that pilot program." IIRIRA § 402(a).

28.    IIRIRA also instructs that, "[e]xcept as specifically provided in subsection (e) [referring to the required use of E-Verify by federal agencies, the Legislative Branch and certain immigration law violators], the Secretary of Homeland Security may not require any person or other entity to participate in a pilot program." IIRIRA § 402(a).

## Executive Order 13,465

29.    On June 6, 2008, President George W. Bush signed Executive Order 13,465, which instructs that "Executive departments and agencies that enter into contracts shall *require*, as a condition of

each contract, that the contractor agree to use an electronic employment eligibility verification system designated by the Secretary of Homeland Security to verify the employment eligibility of: (i) all persons hired during the contract term by the contractor to perform employment duties within the United States; and (ii) all persons assigned by the contractor to perform work within the United States on the Federal contract."  Exec. Order No. 13,465 § 3, 73 Fed. Reg. 33,285, 33,286 (June 11, 2008) (amending Exec. Order No. 12,989 § 5) (emphasis added).

30.     Executive Order 13,465 also commanded that the Federal Acquisition Regulation ("FAR"), 48 C.F.R. pts. 1-99, be amended to "implement the debarment responsibility, the employment eligibility verification responsibility, and other related responsibilities assigned to heads of departments and agencies under this order."  *Id.*  The FAR provides "uniform policies and procedures for acquisition by all executive agencies."  48 C.F.R. § 1.101.

31.     As justification for these new requirements, President Bush explained that Executive Order 13,465 was "designed to promote economy and efficiency in Federal Government procurement."  Exec. Order No. 13,465 § 1(b), 73 Fed. Reg. at 33,285.

32.     Although Executive Order 13,465 instructed the Secretary that he "shall administer and enforce this order" requiring participation in an electronic employment verification system, Exec. Order No. 13,465 § 3, 73 Fed. Reg. at 33,286, Executive Order 13,465 made no mention of IIRIRA's prohibition against requiring "any person or other entity to participate in a pilot program" such as E-Verify.

### The Proposed Rule

33.     On June 12, 2008, the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (collectively, the "Councils") published a notice of proposed rulemaking to begin implementation of Executive Order 13,465's instruction that the FAR be amended to require participa-

tion in E-Verify.  *See* Proposed Employment Eligibility Verification Rule ("Proposed Rule"), 73 Fed. Reg. 33,374 (June 12, 2008).  The Proposed Rule was signed by Mr. Matera.  *See id.* at 33,380.

34.    In addition to repeating Executive Order 13,465's claimed justification of promoting efficiency and economy in government procurement, the Proposed Rule explained that "one of the Government's primary responsibilities is the enforcement of the immigration laws of the United States.  It is appropriate to ensure that Government contractors and subcontractors abide by the immigration laws that the Government enforces."  Proposed Rule, 73 Fed. Reg. at 33,375.  In addition, the Proposed Rule stated that "[t]he new contractual requirement to use the E-Verify System will enhance the Government's ability to protect national security and ensure compliance with the nation's immigration laws—core aspects of the Government's mission that otherwise could be compromised by the presence of unauthorized aliens in Government facilities or by the employment of unauthorized aliens in the Government's supply chain."  Proposed Rule, 73 Fed. Reg. at 33,378.

35.    Among other things, the Proposed Rule proposed to amend the FAR such that a clause would be added to government contracts over $3,000 in value, whereby the contractor would be required to use E-Verify to confirm that all "new hires, and all employees (existing and new) directly engaged in the performance of work under Federal contracts, are authorized to work in the United States."  Proposed Rule, 73 Fed. Reg. at 33,375.  Specifically excluded from the Proposed Rule's reach were contracts for "commercially available off-the-shelf (COTS) items or items that would be COTS items but for minor modifications."  Proposed Rule, 73 Fed. Reg. at 33,375.

36.    Contractors covered by the Proposed Rule would be required to "[e]nroll in the E-Verify program within 30 calendar days of contract award, and use E-Verify within 30 calendar days thereafter to verify employment eligibility of their employees assigned to the contract at the time of enrollment in

E-Verify." Proposed Rule, 73 Fed. Reg. at 33,381 (proposed 48 C.F.R. § 22.1802(b)(1)(i)). If contractors were already enrolled in E-Verify at the time of contract award, the Proposed Rule explained that contractors would be required to "use E-Verify within 30 calendar days of contract award to verify employment eligibility of their employees assigned to the contract." Proposed Rule, 73 Fed. Reg. at 33,381 (proposed 48 C.F.R. § 22.1802(b)(1)(ii)).

37.    "Following this initial period," contractors would be required to "initiate verification of all new hires of the contractor and of all employees newly assigned to the contract within three business days of their date of hire or date of assignment to the contract." Proposed Rule, 73 Fed. Reg. at 33,381 (proposed 48 C.F.R. § 22.1802(b)(2)).

38.    The foregoing requirements were not limited to contractors. Any contractor covered by the Proposed Rule would be required to "flow down" this requirement to its subcontractors for non-COTS subcontracts over $3,000 in value. Proposed Rule, 73 Fed. Reg. at 33,381 (proposed 48 C.F.R. § 22.1802(c)).

39.    The Proposed Rule estimated that in federal fiscal year 2009 alone, employers' startup and training costs for complying with these new requirements would total $61,630,740. Proposed Rule, 73 Fed. Reg. at 33,377.

**The Revised Memorandum of Understanding**

40.    The Proposed Rule explained that before a government contractor or subcontractor can participate in E-Verify, the contractor must enter into a revised Memorandum of Understanding ("MOU") with the Department of Homeland Security and the Social Security Administration. Proposed Rule, 73 Fed. Reg. at 33,376. "Federal contractors' compliance with [the] revised MOU," the Proposed Rule explained, would "be a performance requirement under the terms of the Federal contract or subcon-

tract, and the contractor must consent to the release of information relating to compliance with its verification responsibilities to contracting officers or other officials authorized to review the Employer's compliance with Federal contracting requirements." *Id.* at 33,375.

41.     In issuing the Proposed Rule, however, the Councils did not publish the full text of the revised MOU in the *Federal Register*.  Instead, they placed a draft of the revised MOU "in the docket for [the proposed] rulemaking" and made it "available online at *http://www.regulations.gov*."  Proposed Rule, 73 Fed. Reg. at 33,377.

42.     Among other things, the revised MOU explains that "[a]uthority for the E-Verify program is found in Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009, as amended (8 U.S.C. § 1324a note)."  Rev. MOU art. I, ¶ 2.

### The Secretary's E-Verify Designation Notice

43.     The day after the Proposed Rule appeared in the *Federal Register*, the Secretary published a one-page notice designating E-Verify as the "electronic employment eligibility verification system to be used by Federal contractors."  Notice of Designation of the Electronic Employment Eligibility Verification System Under Executive Order 12989 ("E-Verify Designation Notice"), 73 Fed. Reg. 33,837 (June 13, 2008).

44.     In issuing the E-Verify Designation Notice, the Secretary explained that he was acting "[p]ursuant to" Executive Order 13,465, which he acknowledged "instructs Federal departments and agencies that enter into contracts to require, as a condition of each contract, that the contractor agree to use an electronic employment eligibility verification system designated by the Secretary of Homeland Security to verify the employment eligibility of all persons hired during the contract term by the contrac-

tor to perform employment duties within the United States, and all persons assigned by the contractor to perform work within the United States on the Federal contract."  E-Verify Designation Notice, 73 Fed. Reg. at 33,837.

**The Final Rule**

45.     On November 14, 2008, the Councils published a final rule with a January 15, 2009 effective date amending the FAR in order to require certain government contractors and subcontractors to utilize E-Verify to verify employment eligibility of all newly hired employees and all employees directly engaged in the performance of work in the United States under contracts with the Federal Government. *See* Final Employment Eligibility Verification Rule ("Final Rule"), 73 Fed. Reg. 67,651 (Nov. 14, 2008) (to be codified within 48 C.F.R. pts. 2, 22 and 52).  The Final Rule was signed by Mr. Matera.  *See id.* at 67,703.

46.     Among other things, the Final Rule explained that "[m]any commenters challenge[d] the Councils' authority to promulgate the Rule, arguing that the insertion of a clause into Federal contracts that commits Federal contractors to use E-Verify conflicts with the congressional intent expressed in the [IIRIRA] that participation in E-Verify be 'voluntary.'"  Final Rule, 73 Fed. Reg. at 67,655.

47.     In response, the Councils argued that, because IIRIRA applies "only to the Secretary of Homeland Security and does not apply to the President or the Councils," the "requirement to insert the contract clause set forth in this rule [pursuant to Executive Order 13,465] is not a requirement imposed by the Secretary of Homeland Security and therefore does not run afoul of section 402(a) of IIRIRA."  Final Rule, 73 Fed. Reg. at 67,656.  In addition, the Councils argued that even if IIRIRA's prohibition against requiring participation in E-Verify applied to the President and the Councils, the Final Rule does

not "require" anything because an employer is not required to be a government contractor or subcontractor. *See* Final Rule, 73 Fed. Reg. at 67,656.

48.     The Final Rule made several substantive changes to the rule first proposed on June 12, 2008.  For example, the Final Rule increased the contract dollar threshold from $3,000 to $100,000.  *See* Final Rule, 73 Fed. Reg. at 67,654.  The dollar threshold for subcontracts, however, was kept at $3,000. *See* Final Rule 73 Fed. Reg. at 67,676.

49.     The Final Rule also increased the timelines for covered entities to enroll in E-Verify and to begin verifying newly hired employees and employees assigned to a covered federal contract.  *See, e.g.*, Final Rule, 73 Fed. Reg. at 67,654 ("The final rule amends the proposed rule to permit Federal contractors participating in the E-Verify program for the first time a longer period—90 calendar days from enrollment instead of 30 days as initially proposed—to begin using the system for new and existing employees.  The final rule also provides a longer period after this initial enrollment period—30 calendar days instead of 3 business days—for contractors to initiate verification of existing employees who have not previously gone through the E-Verify system when they are newly assigned to a covered Federal contract.").

50.     In addition, the Final Rule explained that institutions of higher education, state and local governments, federally recognized Indian tribes, and "sureties performing under a takeover agreement entered into with a Federal agency pursuant to a performance bond" did not have to use E-Verify on all new hires.  Instead, these entities need only verify employees assigned to a covered federal contract. *See* Final Rule, 73 Fed. Reg. at 67,704 (to be codified at 48 C.F.R. § 22.1802(b)).

51.     In spite of these changes, the Final Rule estimated that in federal fiscal year 2009 alone, employers' startup and training costs for complying with these new requirements would total

$188,138,945—some $126,508,205 greater than the cost estimated in the Proposed Rule ($61,630,740).

*Compare* Final Rule, 73 Fed. Reg. at 67,702, *with* Proposed Rule, 73 Fed. Reg. at 33,377.

52.     The Final Rule also dedicated twelve of its fifty-three preamble pages responding to nu-

merous comments that criticized the Proposed Rule because it did not consider all of the relevant costs

that complying with the proposed FAR amendments would entail.  *See* Final Rule, 73 Fed. Reg. at

67,686-67,698.  For example, in responding to critical comments submitted by the Small Business Ad-

ministration's Office of Advocacy and others, the Councils argued that regulatory flexibility analyses

were "only to include the direct impacts of a regulation on a small entity that is required to comply with

the regulation."  Final Rule, 73 Fed. Reg. at 67,686.

### The Requirements Imposed by Executive Order 13,465 and the Final Rule
### Have Harmed and Will Continue to Harm Plaintiffs' Members Irreparably

53.     Plaintiffs' respective members are "adversely affected or aggrieved" by the requirements

set forth in Executive Order 13,465 and the Final Rule within the meaning of 5 U.S.C. § 702.

54.     The requirements imposed by Executive Order 13,465 and the Final Rule are contrary to

law.  Included within Plaintiffs' respective memberships are a significant number of businesses and hu-

man resource professionals that will be required to comply with the regulations at issue in this case ab-

sent timely judicial relief.  Many of these businesses and human resource professionals have already

been forced to dedicate significant resources to prepare for this eventuality.

55.     Moreover, the practical difficulty of identifying which employees are covered by the re-

quirements imposed by Executive Order 13,465 and the Final Rule will force many of Plaintiffs' respec-

tive members to electronically "reverify" all of their existing employees hired after November 6, 1986.

For example, the Final Rule specifies that "all employees assigned to the contract" must be electroni-

cally reverified using E-Verify.  Final Rule, 73 Fed. Reg. at 67,704 (to be codified at 48 C.F.R.

17

§ 22.1802(b)(3)).  According to the Final Rule, an "employee assigned to the contract" is "an employee who was hired after November 6, 1986, who is directly performing work, in the United States, under a contract that is required to include the clause prescribed at [48 C.F.R. §] 22.1803."  Final Rule, 73 Fed. Reg. at 67,703 (to be codified at 48 C.F.R. § 22.1801).  Specifically excluded from the definition of an "employee assigned to the contract" is an employee who (1) "[n]ormally performs support work, such as indirect or overhead functions"; and (2) "[d]oes not perform any substantial duties applicable to the contract."  Final Rule, 73 Fed. Reg. at 67,703 (to be codified at 48 C.F.R. § 22.1801).  The relative ambiguity of this standard—and the potential that its violation may result in suspension or debarment—will lead many of Plaintiffs' respective members to electronically "reverify" all of their existing employees hired after November 6, 1986.

56.     Apart from the significant expense and time burden this will place on many of Plaintiffs' respective members, having to electronically "reverify" all existing employees hired after November 6, 1986, increases substantially the likelihood that many of Plaintiffs' respective members will face expensive and time-consuming lawsuits brought by individuals who believe they have been discriminated against on the basis of race and/or national origin.

57.     The foregoing injuries (1) are a direct result of the requirements imposed by Executive Order 13,465 and the Final Rule, (2) cannot be adequately compensated by money damages, (3) will be irreparable absent injunctive relief and (4) are redressable by appropriate injunctive relief and a declaration that the requirements imposed by Executive Order 13,465 and the Final Rule are invalid.

## CAUSES OF ACTION

### Count I:

**The Final Rule Is Invalid Because the Secretary's E-Verify Designation Notice Violated IIRIRA**

58.     Plaintiffs repeat and reallege paragraphs 1-57.

59.     The Secretary's issuance of the E-Verify Designation Notice constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

60.     Pursuant to 5 U.S.C. § 706(2)(C), a reviewing court shall hold unlawful and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

61.     In relevant part, IIRIRA provides that "the Secretary of Homeland Security may not require any person or other entity to participate in a pilot program" such as E-Verify.  IIRIRA § 402(a).

62.     By designating E-Verify as the "electronic employment eligibility verification system to be used by Federal contractors," E-Verify Designation Notice, 73 Fed. Reg. 33,837, the Secretary violated IIRIRA's express statutory prohibition against "requir[ing] any person or other entity to participate in a pilot program" such as E-Verify.  IIRIRA § 402(a).

### Count II:

**The Requirements Imposed by Executive Order 13,465 and the Final
Rule Are Invalid Because They Are Expressly Prohibited by IIRIRA**

63.     Plaintiffs repeat and reallege paragraphs 1-57.

64.     Issuance of the Final Rule constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

65.    Pursuant to 5 U.S.C. § 706(2)(C), a reviewing court shall hold unlawful and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

66.    The boundaries of the Executive Branch's authority are limited by IIRIRA, which provides that "the Secretary of Homeland Security may not require any person or other entity to participate in a pilot program" such as E-Verify.  IIRIRA § 402(a).

67.    Executive Order 13,465 and the Final Rule violate this express statutory prohibition because they "require any person or other entity to participate in a pilot program" within the meaning of IIRIRA.

68.    Therefore, because the requirements imposed by Executive Order 13,465 and the Final Rule are in direct violation of IIRIRA, Executive Order 13,465 and the Final Rule are invalid and must be set aside.

### Count III:

**The Requirements Imposed by Executive Order 13,465 and the Final Rule Are Invalid Because, Even if They Are Not Expressly Prohibited by IIRIRA, the Requirements Imposed by Executive Order 13,465 and the Final Rule Are Not Authorized by the Federal Property and Administrative Services Act of 1949**

69.    Plaintiffs repeat and reallege paragraphs 1-57.

70.    Issuance of the Final Rule constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

71.    Pursuant to 5 U.S.C. § 706(2)(C), a reviewing court shall hold unlawful and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

72.     The Federal Property and Administrative Services Act of 1949 ("Procurement Act") authorizes the President to "prescribe policies and directives" that the President considers "necessary to carry out" the Procurement Act and that are "consistent" with the Act's purpose of "provid[ing] the Federal Government with an economical and efficient" procurement system.  40 U.S.C. §§ 101, 121(a).

73.     The requirements imposed by Executive Order 13,465 and the Final Rule are not authorized by the Procurement Act because there does not exist a "manifestly close nexus between the Procurement Act's criteria of efficiency and economy," on the one hand, and the requirements imposed by Executive Order 13,465 and the Final Rule.  *Liberty Mutual Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981).

## Count IV:

### The Electronic-Reverification-of-Existing-Employees Requirement Imposed by Executive Order 13,465 and the Final Rule Is Invalid Because It Exceeds the E-Verify Program's Statutory Authority

74.     Plaintiffs repeat and reallege paragraphs 1-57.

75.     Issuance of the Final Rule constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

76.     Pursuant to 5 U.S.C. § 706(2)(C), a reviewing court shall hold unlawful and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

77.     The statutory authority for the E-Verify program is limited to employment verification of new hires in connection with the Form I-9 process.  *See, e.g.*, IIRIRA §§ 402(c)(2)(A)(i) (describing scope of employer's voluntary election to participate in a pilot program such as E-Verify as being limited to the employer's "hiring (and all recruitment or referral)" and providing no statutory authorization

for the use of a pilot program to electronically reverify existing employees), 403(a) (describing employer's voluntary participation in using E-Verify "in the case of the hiring (or recruitment or referral) for employment in the United States" and providing no statutory authorization for the use of a pilot program such as E-Verify to electronically reverify existing employees).

78.     Executive Order 13,465 and the Final Rule require employers to use E-Verify to electronically reverify the employment eligibility of existing employees hired after November 6, 1986, who are assigned to covered contracts and subcontracts.

79.     Because the electronic-reverification-of-existing-employees requirement imposed by Executive Order 13,465 and the Final Rule exceeds the statutory authority for the E-Verify program, the electronic-reverification-of-existing-employees requirement is unlawful and must be set aside.

### Count V:

### The Requirements Imposed by Executive Order 13,465 and the Final Rule Are Legislative in Nature and Therefore Exceed the Executive Branch's Constitutional Authority to Take Care That the Laws Be Faithfully Executed

80.     Plaintiffs repeat and reallege paragraphs 1-57.

81.     Issuance of the Final Rule constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

82.     Pursuant to 5 U.S.C. § 706(2)(B), a reviewing court shall hold unlawful and set aside agency action found to be "contrary to constitutional right, power, privilege, or immunity."

83.     The Constitution of the United States vests "[a]ll legislative Powers" in Congress.  U.S. Const. art. I, § 1.  In turn, the Constitution provides that the "executive Power shall be vested in a President of the United States of America," *id.* art. II, § 1, cl. 1, and that the President possesses the responsibility to "take Care that the Laws be faithfully executed," *id.* § 3.  "[T]he President's power to see that

the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at

587.

84.     The requirements imposed by Executive Order 13,465 and the Final Rule constitute law-

making for which the Executive Branch lacks constitutional authority, and therefore the requirements

imposed by Executive Order 13,465 and the Final Rule are illegal and must be set aside.

### Count VI:

### The Requirements Imposed by the Final Rule May Not Be Enforced Because
### Defendants Failed to Publish the Revised Memorandum of Understanding in the *Federal Register*

85.     Plaintiffs repeat and reallege paragraphs 1-57.

86.     Issuance of the Final Rule and revised MOU constitutes "final agency action" within the

meaning of 5 U.S.C. § 704.

87.     Pursuant to 5 U.S.C. § 706(2)(D), a reviewing court shall hold unlawful and set aside

agency action found to be "without observance of procedure required by law."

88.     The Office of Federal Procurement Policy Act ("Procurement Policy Act") provides that

"no procurement policy, regulation, procedure, or form (including amendments or modifications thereto)

relating to the expenditure of appropriated funds that has (1) a significant effect beyond the internal op-

erating procedures of the agency issuing the procurement policy, regulation, procedure or form, or (2) a

significant cost or administrative impact on contractors or offerors, may take effect until 60 days after

the procurement policy, regulation, procedure, or form is published for public comment in the Federal

Register . . . ." 41 U.S.C. § 418b(a).  The "notice of a proposed procurement policy, regulation, proce-

dure, or form prepared for publication in the Federal Register shall include . . . the text of the proposal

or, if it is impracticable to publish the full text of the proposal, a summary of the proposal and a state-

ment specifying the name, address, and telephone number of the officer or employee of the executive

agency from whom the full text may be obtained."  § 418b(c)(1).  The Procurement Policy Act's publication requirement may only be waived "if urgent and compelling circumstances make compliance with such requirements impracticable."  § 418b(d)(1).

89.     The revised MOU is a "procurement policy, regulation, procedure, or form" within the meaning of the Procurement Policy Act.

90.     It was not impracticable to publish the full text of the revised MOU in the *Federal Register*, nor did urgent and compelling circumstances make publication of the full text of the revised MOU in the *Federal Register* impracticable.

91.     Therefore, because Defendants failed to publish the full text of the revised MOU in the *Federal Register*, and because the revised MOU is a necessary component of the regulatory scheme established by the Final Rule, the Final Rule is procedurally invalid and its requirements may not be enforced.

### Count VII:

### The Requirements Imposed by the Final Rule May Not Be
### Enforced Because Defendants Violated the Regulatory Flexibility Act

92.     Plaintiffs repeat and reallege paragraphs 1-57.

93.     Issuance of the Final Rule constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

94.     Pursuant to 5 U.S.C. § 706(2)(D), a reviewing court shall hold unlawful and set aside agency action found to be "without observance of procedure required by law."  In addition, the Regulatory Flexibility Act expressly provides that an agency's compliance with that statute's procedures is subject to judicial review.  5 U.S.C. § 611.

95.     The Regulatory Flexibility Act requires a federal agency to evaluate the adverse economic effects of, and less harmful alternatives to, its actions before taking them.  For example, the Regulatory Flexibility Act provides that when an agency promulgates a final rule after being required by law to publish a notice of proposed rulemaking, the agency must prepare a final regulatory flexibility analysis.  5 U.S.C. § 604(a).  Among other things, the final regulatory flexibility analysis must contain a "description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record."  § 604(a)(4).

96.     The Councils have accepted that the requirements of the Regulatory Flexibility Act apply to the Proposed Rule and the Final Rule by refusing to certify that the Proposed Rule and the Final Rule would not have a significant economic impact on a substantial number of small entities.  *See, e.g.*, Final Rule, 73 Fed. Reg. at 67,687.

97.     The Councils failed to meet the requirements imposed by the Regulatory Flexibility Act for proposed and final regulations by, among other things, failing to account for the significant costs to employers who, although they have previously complied in good faith with all existing immigration laws, must replace workers who become unauthorized to work solely by operation of the requirements imposed by Executive Order 13,465.

98.     Because Defendants failed to comply with the Regulatory Flexibility Act, the Final Rule is unlawful and must be set aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.      Provide for expeditious proceedings in this action in light of the Final Rule's January 15, 2009 effective date;

B.      Enter judgment in Plaintiffs' favor;

C.      Declare Executive Order 13,465 and the Final Rule illegal and void;

D.      Permanently enjoin Defendants, their agents, servants, employees, successors and assigns from enforcing the requirements imposed by Executive Order 13,465 and the Final Rule;

E.      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action pursuant to 28 U.S.C. § 2412; and

F.      Grant Plaintiffs such other relief as the Court deems just and proper.

[*SIGNATURE PAGE FOLLOWS*]

Dated: December 23, 2008

                                 Respectfully submitted,

*Of Counsel for Plaintiff*
*Chamber of Commerce of*
*the United States of America*:

                                 PROSKAUER ROSE LLP

Robin S. Conrad[*]
NATIONAL CHAMBER
LITIGATION CENTER, INC.
1615 H Street, NW
Washington, DC 20062-0002
202.463.5337
202.463.5346 (fax)
rconrad@uschamber.com

                                 By: _____
                                 Lawrence Z. Lorber (Bar No. 15110)
                                 Malcolm J. Harkins III[*]
                                 James F. Segroves (Bar No. 17268)
                                 1001 Pennsylvania Avenue, NW
                                 Suite 400 South
                                 Washington, DC 20004-2533
                                 202.416.6800
                                 202.416.6899 (fax)
                                 llorber@proskauer.com

*Of Counsel for Plaintiff Associated*
*Builders and Contractors, Inc.*:

                                 mharkins@proskauer.com
                                 jsegroves@proskauer.com

Robert A. Hirsch[*]
ASSOCIATED BUILDERS
AND CONTRACTORS, INC.
1615 H Street, NW
Washington, DC 20062
(703) 812-2039
(703) 812-8202 (fax)
hirsch@abc.org

                                 David B. Grunblatt[*]
                                 One Newark Center
                                 Newark, NJ 07102-5211
                                 973.274.3200
                                 973.274.3299 (fax)
                                 dgrunblatt@proskauer.com

*Of Counsel for Plaintiff Society*
*for Human Resource Management*:

                                 *Counsel for Plaintiffs Chamber of Commerce*
                                 *of the United States of America; Associated*
                                 *Builders and Contractors, Inc.; Society for*
                                 *Human Resource Management; American*

Nancy B. Hammer[*]
SOCIETY FOR HUMAN
RESOURCE MANAGEMENT
1800 Duke Street
Alexandria, VA 22314
(703) 535-6030
(703) 258-6030 (fax)
Nancy.Hammer@shrm.org

                                 *Council on International Personnel; and*
                                 *HR Policy Association*

*Of Counsel for Plaintiff*
*HR Policy Association*:

                                 [*] *Motion for Admission Pro Hac Vice to Be Filed*

Daniel V. Yager[*]
HR POLICY ASSOCIATION

1100 13th Street, NW, Suite 850
Washington, DC 20005
(202) 789-8670
(202) 789-0064 (fax)
dyager@hrpolicy.org