**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF | * | |
| THE UNITED STATES OF AMERICA, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. AW-08-3444 |
| | * | |
| JANET NAPOLITANO, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**************************************************************************

## MEMORANDUM OPINION

Plaintiffs the Chamber of Commerce of the United States of America, the Associated Builders and Contractors, Inc., the Society for Human Resource Management, the American Council on International Personnel, and the HR Policy Association (collectively "Plaintiffs") bring this action against Defendants the United States of America, Janet Napolitano (Secretary of Homeland Security), and Albert A. Matera (Chairman of the Civilian Agency Acquisition Council) (collectively "Defendants") challenging the legality of Executive Order 13,465, a final rule amending the Federal Acquisition Regulation ("FAR"), and a designation notice issued by the Secretary of Homeland Security.  Currently pending before the Court are Plaintiffs' Motion for Summary Judgment and Defendants' Cross Motion for Summary Judgment.  The Court has reviewed the entire record, as well as the pleadings and exhibits, with respect to the instant motions.  On August 21, 2009, the Court conducted a hearing on the pending motions.  *See* Local Rule 105.6 (D. Md. 2008).  For the reasons stated more fully below, the Court will grant Defendants' Cross Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

I.      **STATUTORY BACKGROUND**

The Federal Property and Administrative Services Act of 1949 ("Procurement Act"), 40 U.S.C. §§ 101, *et seq.*, allows the President to "prescribe policies and directives that the President considers necessary to carry out" the Procurement Act's provisions, so long as the President's directives are "consistent" with the Procurement Act.   40 U.S.C. § 121.   The Procurement Act thus permits Presidential directives so long as they are "reasonably related to the Procurement Act's purpose of ensuring efficiency and economy in government procurement."  *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981).

The overarching immigration statute in the United States is the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101, *et seq.*, which was enacted in 1952 and has been amended several times since then.  In 1986, Congress amended the INA to prohibit the hiring or continued employment of aliens when employers know that the aliens are unauthorized to work in the United States.  *See* Immigration Reform and Control Act of 1996 ("IRCA"), 8 U.S.C. § 1324a.  To ensure compliance with this requirement, IRCA created a document-based system for employers to verify that potential employees are authorized to work in the United States. This document-based system essentially requires employers and employees to complete a form known as the Form I-9.  The Form I-9 is not filed with any federal agency.  Rather, employers must retain the Form I-9 for a set time period and must make these forms available for inspection by federal officials.

The INA was further amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, tit. IV, subtit. A, 110 Stat. 3009-546, 3009-655 (codified as amended at 8 U.S.C. § 1324a note).  Among other things, IIRIRA instructed the Secretary of Homeland Security to establish and administer pilot programs

to confirm employment eligibility.  One of those programs is E-Verify,[1] which is an internet-based system designed to enable employers to verify electronically that newly hired employees are authorized to work in the United States.  E-Verify is operated by the United States Citizenship and Immigration Services, within the Department of Homeland Security, in partnership with the Social Security Administration.  IIRIRA states that:

> [A]ny person or other entity that conducts any hiring (or recruitment or referral) in a State in which a pilot program is operating may elect to participate in that pilot program. Except as specifically provided in subsection (e), the [Secretary of Homeland Security][2] may not require any person or other entity to participate in a pilot program.

IIRIRA § 402(a).  Subsection (e) requires use of E-Verify by federal agencies, the Legislative Branch, and certain immigration law violators.  IIRIRA § 402(e).  E-Verify is authorized on a temporary basis, and Congress must continually renew the program.  E-Verify is currently authorized through September 30, 2009.

The FAR, 48 C.F.R. pts. 1-99, is the regulation that sets "uniform policies and procedures for acquisition by all executive agencies."  48 C.F.R. § 1.101.  Among other things, the FAR contains standard contract provisions that must be used by federal contracting officers.  48 C.F.R. pt. 52.

## II.   FACTUAL BACKGROUND

On February 13, 1996, President William J. Clinton issued an Executive Order providing for the debarment of certain federal contractors who failed to comply with the INA.  *See* Exec. Order No. 12,989, 61 Fed. Reg. 6,091 (Feb. 15, 1996).  In issuing Executive Order 12,989, President Clinton found that "contractors that employ unauthorized alien workers are necessarily

---

[1] E-Verify was originally referred to as the basic pilot program.  In addition to E-Verify, IIRIRA created two additional pilot programs, neither of which is still in service.

[2] IIRIRA originally addressed the duties of the Attorney General.  However, in 2003, the Attorney General's duties under IIRIRA were transferred to the Secretary of Homeland Security.  *See* Basic Pilot Program Extension and Expansion Act of 2003, Pub. L. No. 108-156, § 3(d). 117 Stat. 1944, 1945.

less stable and dependable procurement sources than contractors that do not hire such persons."

*Id.*  Executive Order 12,989 required the Attorney General to conduct investigations and

determine whether a contractor was in compliance with the INA's employment provisions.  On

February 28, 2003, President George W. Bush amended Executive Order 12,989 to reflect that

the Secretary of Homeland Security, instead of the Attorney General, would be responsible for

conducting these investigations into a contractor's compliance with the INA's employment

provisions.  *See* Exec. Order No. 13,286, 68 Fed. Reg. 10619 (Mar. 5, 2003).

On June 6, 2008, President Bush signed Executive Order 13,465, which further amended

Executive Order 12,989.  *See* Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 11, 2008).

Executive Order 13,465 states that:

> Executive departments and agencies that enter into contracts shall require, as a
> condition of each contract, that the contractor agree to use an electronic
> employment eligibility verification system designated by the Secretary of
> Homeland Security to verify the employment eligibility of: (i) all persons hired
> during the contract term by the contractor to perform employment duties within
> the United States; and (ii) all persons assigned by the contractor to perform work
> within the United States on the Federal contract.

*Id.*

Executive Order 13,465 ordered that the Secretary of Defense, the Administrator of

General Services, and the Administrator of National Aeronautics and Space Administration

("NASA") (collectively the "Council") amend the FAR to "implement the debarment

responsibility, the employment eligibility verification responsibility, and other related

responsibilities assigned to heads of departments and agencies under this order."[3]

---

[3] Under the FAR, the Civil Agency Acquisition Council and the Defense Acquisition Regulations Council are
responsible for revising the FAR, 48 C.F.R. § 1.201-1; and the Secretary of Defense, the Administrator of General
Services, and the Administrator of NASA are responsible for ensuring that federal agencies comply with the FAR.
48 C.F.R. § 1.202.  Defendants argue that the Secretary of Defense, the Administrator of General Services, and the
Administrator of NASA are the proper Defendants in addition to the United States.  Defendants further argue that
the Secretary of Homeland Security and Matera are not proper Defendants.  With respect to Matera, Defendants
argue that the Civil Agency Acquisition Council is an inter-agency council and not an agency, so it cannot be sued.

On June 9, 2008, the Secretary of Homeland Security signed a one-page notice designating E-Verify as the "electronic employment eligibility verification system to be used by Federal contractors." *See* Designation of the Electronic Employment Eligibility Verification System Under Executive Order 12,989 (the "Secretary's Designation"), 73 Fed. Reg. 33,837 (June 13, 2008). In the Secretary's Designation, the Secretary of Homeland Security explained that he was acting pursuant to Executive Order 12,989 as amended by Executive Order 13,465.

On June 10, 2008, Defendant Matera, on behalf of the Council, signed a notice of proposed rulemaking to implement Executive Order 13,465. On June 12, 2008, the Council published the notice of proposed rulemaking in the Federal Register. *See* Proposed Employment Eligibility Verification Rule ("Proposed Rule"), 73 Fed. Reg. 33,374 (June 12, 2008). The Proposed Rule sought to:

> [A]mend the [FAR] to require that certain contracts contain a clause requiring that the contractor and certain subcontractors utilize the E-Verify System to verify employment of all newly hired employees of the contractor or subcontractor and all employees directly engaged in the performance of work in the United States under those contracts.

*Id.* The Proposed Rule excluded contracts for commercially available off-the-shelf ("COTS") items and contracts less than $3,000 in value (the "contract dollar threshold"). The Proposed Rule included an implementation timeline.

The Proposed Rule explained that before a government contractor or subcontractor could participate in E-Verify, the contractor must enter a revised Memorandum of Understanding ("MOU") with the Department of Homeland Security and the Social Security Administration.

---

The Court agrees that the Administrator of General Services, Secretary of Defense, and Administrator of NASA should be named as Defendants rather than Matera. *See* 48 C.F.R. § 1.201-1 & 1.202. The Court also agrees with Defendants that the Secretary of Homeland Security is not a proper party to this suit. Quite simply, the Court fails to see how the Secretary's Designation adversely affected Plaintiffs or caused them to suffer legal harm. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). It is the Final Rule and Executive Order 13,465 that affect Plaintiffs.

*Id.*  The revised MOU was not published in the Federal Register.  Rather, a draft of the revised MOU was placed in the official rulemaking docket and made publicly available on the internet. In addition, the Proposed Rule, which was published in the Federal Register, directed interested parties to the location of the revised MOU, and the Council received comments on the revised MOU.

During the notice and comment period, many commentators challenged the Council's power to implement the Proposed Rule, asserting that the rule violated IIRIRA.  Other commentators argued that the Council failed to consider the costs that businesses would face if the Proposed Rule became final.

On November 14, 2008, the Council published a final rule amending the FAR by adding "a clause into Federal contracts committing Government contractors [and subcontractors] to use the . . . E-Verify System to verify that all of the contractors' new hires, and all employees (existing and new) directly performing work under Federal contracts, are authorized to work in the United States."  *See* Final Employment Eligibility Verification Rule ("Final Rule"), 73 Fed. Reg. 67,651 (Nov. 14, 2008).  The Final Rule was signed by Defendant Matera and had an effective date of January 15, 2009.

The Final Rule increased the contract dollar threshold from $3,000 to $100,000 for prime contracts but kept the contract dollar threshold for subcontracts at $3,000.  The Final Rule also allowed government contractors a longer implementation time period to enroll in and begin using E-Verify.  The Final Rule exempted contracts for COTS items, contracts for work performed outside of the United States, and contracts that last less than 120 days.

On December 23, 2008, Plaintiff filed this action.  On January 8, 2009, the parties reached an agreement whereby the Final Rule's effective date was delayed until January 19,

2009 and the Final Rule's applicability date[4] was extended until February 20, 2009.  Following

the inauguration of President Barack H. Obama on January 20, 2009, the Council delayed the

applicability date several times, ultimately until September 8, 2009, in order to allow the new

Administration time to consider the Executive Order 13,465 and the Final Rule.  After several

months, the Administration decided to implement the Final Rule, and thus the Final Rule will

become applicable on September 8, 2009.  Accordingly, the Court must address the parties' cross

motions for summary judgment.

## III.    <u>STANDARD OF REVIEW</u>

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The court must "draw all justifiable

inferences in favor of the nonmoving party, including questions of credibility and of the weight

to be accorded to particular evidence."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520

(1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  When parties file

cross motions for summary judgment, the court must view each motion in a light most favorable

to the non-movant.  *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).  To defeat a motion for

summary judgment, the nonmoving party must come forward with affidavits or other similar

evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  While the evidence of the nonmoving party is to

be believed and all justifiable inferences drawn in his or her favor, a party cannot create a

genuine dispute of material fact through mere speculation or compilation of inferences.  *See*

---

[4] The applicability date is the date on which the government will begin inserting a clause regarding the use of E-Verify into the government contracts covered by the Final Rule.

*Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998).   Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.   *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## IV.   ANALYSIS

There are no genuine disputes of material fact in this case, and thus the Court must determine which party is entitled to summary judgment.  In the Complaint, Plaintiffs assert seven counts: (1) Count I – Secretary's Designation Violated IIRIRA; (2) Count II – Executive Order 13,465 and the Final Rule Prohibited by IIRIRA; (3) Count III - Executive Order 13,465 and the Final Rule Not Authorized by the Procurement Act; (4) Count IV - The Reverification-of-Existing-Employees Requirement Imposed by Executive Order 13,465 and the Final Rule Exceeds E-Verify's Statutory Authority; (5) Count V - Executive Order 13,465 and the Final Rule Are Legislative In Nature and Therefore Exceed the Executive Branch's Constitutional Authority; (6) Count VI - Failure to Publish the Revised MOU in the Federal Register Violated the Office of Federal Procurement Policy Act; and (7) Count VII - Violation of the Regulatory Flexibility Act.

Defendants argue that: (1) Counts III and V fail because Executive Order 13,465 and the Final Rule are a proper use of the President's authority under the Procurement Act to make rules to improve the efficiency and economy of the procurement process; (2) Counts I, II, and IV fail because Executive Order 13,465 and the Final Rule were enacted pursuant to the Procurement Act and not IIRIRA; (3) Counts I, II, and IV fail because Executive Order 13,465 and the Final Rule do not violate IIRIRA; and (4) Counts VI and VII fail because the Council complied with the Office of Federal Procurement Policy Act and the Regulatory Flexibility Act.

After reviewing the record, researching the issues, and considering the arguments asserted during oral argument and in the parties' briefs, the Court agrees with Defendants. Each of Plaintiffs' Counts is addressed below.

### A.      Count I – Secretary's Designation Violated IIRIRA

Plaintiffs argue that the Secretary's Designation violated IIRIRA because the Secretary's Designation requires government contractors to use E-Verify and IIRIRA prevents the Secretary from requiring anyone to use E-Verify. Defendants assert that the Secretary's Designation does not require anyone to do anything, because it merely follows the President's mandate in Executive Order 13,465 by designating an electronic system to verify employment eligibility. Plaintiffs argue that it does not matter that the President instructed the Secretary to designate a system because the Secretary still cannot violate IIRIRA. Plaintiffs also argue that the Secretary will be forced to require people to use E-Verify because Executive Order 13,465 states that the "Secretary of Homeland Security . . . shall administer and enforce this order" and authorizes the Secretary to "issue such rules, regulations, or orders, or establish such requirements, as may be necessary and appropriate to implement this order."

After reviewing the Secretary's Designation, the Court does not believe that the Secretary of Homeland Security is requiring any person or entity to do anything. The Secretary's Designation appears to be a ministerial act that merely designates what system is to be used to carry out Executive Order 13,465: E-Verify. It is Executive Order 13,465 and the Final Rule, and not the Secretary's Designation, that dictate that government contracts shall contain a clause requiring contractors to use the system designated by the Secretary, if they wish to enter contracts with the government, which is a voluntary choice. Moreover, as discussed in further detail, the Court finds the logic of *American Federation of Labor & Congress of Industrial*

*Organizations. v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979) persuasive and does not believe that the Final Rule and Executive Order 13,465 require any person or entity to use E-Verify.

### B.   Count II – Executive Order 13,465 and the Final Rule Prohibited by IIRIRA

Plaintiffs argue that Executive Order 13,465 and the Final Rule violate IIRIRA because they require government contractors to use E-Verify, and IIRIRA prevents the Executive Branch from requiring any person or entity to use E-Verify.  Defendants argue that Executive Order 13,465 and the Final Rule were issued pursuant to the Procurement Act and thus do not need to be authorized by IIRIRA.  This argument is irrelevant.  The question is not whether IIRIRA authorized the action; the question is whether IIRIRA prohibited the action.  *See Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1332-39 (D.C. Cir. 1996) (finding illegal an Executive Order that directly conflicted with the National Labor Relations Act).  To answer this question, the Court must address two issues: (1) does IIRIRA § 402(a) apply to the President and Council; and (2) if yes, do Executive Order 13,465 and the Final Rule require any person or entity to use E-Verify.

### a.   Application to President and the Council

Defendants argue that nothing in IIRIRA prohibits the actions in the Final Rule and Executive Order 13,465.  In particular, Defendants assert that IIRIRA only restricts the Secretary of Homeland Security and not the President or the Council.

Plaintiffs argue that IIRIRA applies to the entire Executive Branch and not just the Secretary of Homeland Security.  In support of this argument, Plaintiffs assert that Congress only named the Secretary of Homeland Security because the Secretary was the only official that established and administered E-Verify and because the Secretary is the official responsible for administering all immigration laws.  In other words, Plaintiffs maintain that there was no reason

for Congress to name the entire Executive Branch in IIRIRA.  Plaintiffs further argue that

IIRIRA "evidences Congress's intent to preclude a substantive result—i.e., that no 'person or

other entity' be required to participate in a pilot program such as E-Verify—regardless of who

within the Executive Branch imposes that requirement."  Plaintiffs cite to the legislative history

of IIRIRA.  Specifically, Plaintiffs rely on a provision in the Conference Report related to

IIRIRA, which stated that "[n]othing in Subtitle A shall be construed to permit the Federal

Government to utilize any information, data base, or other records assembled under the subtitle

for any purpose other than as provided for under one of the three pilot programs."  H.R. Conf.

Rep. No. 104-828, at 236.  Similar language was ultimately included in IIRIRA, though the

words "Federal Government" were replaced with "any department, bureau, or other agency of

the United States Government."  *See* IIRIRA § 404(h).

Defendants respond to this argument by asserting that Plaintiffs' reading of the statute is

inconsistent with the clear text of IIRIRA.  In particular, Defendants assert that IIRIRA § 402(a)

discusses only the Secretary of Homeland Security and does not mention the entire Executive

Branch.  Defendants argue that Congress could have drafted IIRIRA to apply to the entire

Executive Branch if Congress had so intended.  Defendants further assert that IIRIRA § 404(h)

merely means that nothing in IIRIRA authorizes government agencies and departments to use E-

Verify for other purposes, but Defendants argue that this section does not restrict actions taken

under other statutes, for example the Procurement Act.

The text of § 402(a) is clear: it applies to the Secretary of Homeland Security.  Had

Congress intended anything else, Congress easily could have drafted this section to apply to the

President or other agencies.  In reaching this decision, the Court does not believe it appropriate

or necessary to consult the legislative history of this statute, given that the text is clear.

Moreover, the Court notes that Congress specifically mentioned other agencies, bureaus, and departments in § 404(h) but did not do so in § 402(a). This discrepancy must be given some weight, and the Court thinks that this discrepancy shows that Congress intended § 402(a) to have a narrow application.

Furthermore, the Court does not believe that § 404(h) renders Executive Order 13,465 or the Final Rule illegal. Section 404(h) does not create an absolute prohibition; it merely states that nothing in IIRIRA prevents other uses of E-Verify. The President, in the case before the Court, acted pursuant to the Procurement Act, not IIRIRA. Thus, the Court does not believe that § 404(h) is applicable. Moreover, the Court notes that § 404(h) applies to "any department, bureau, or other agency"; it does not mention the President.

### b. Is Any Person or Entity Required to Use Verify?

Defendants argue that even if IIRIRA applies to the President and the Council, Executive Order 13,465 and the Final Rule did not violate IIRIRA because they do not require any person or entity to use E-Verify. Citing *Kahn*, 618 F.2d 784, Defendants argue that government contractors are not required to use E-Verify because entities can simply choose not to be a government contractor and thus will not be forced to use E-Verify.

Plaintiffs argue that Executive Order 13,465 and the Final Rule clearly require government contractors to use E-Verify.[5] For example, Plaintiffs point out that the Final Rule states that "The [Council has] agreed on a final rule amending the [FAR] to require certain contractors and subcontractors to uses the E-Verify system . . . ." 73 Fed. Reg. at 67,651

---

[5] At the hearing, though not in their briefs, Plaintiffs argued that Executive Order 13,465 and the Final Rule are illegal because they require government agencies to use E-Verify when contracting. Plaintiffs asserted that IIRIRA § 402(a) states that the Secretary "may not require any person or other entity." Plaintiffs argued that government agencies are other entities. Defendants argued that they did not have the opportunity to brief this issue and that Plaintiffs do not have standing to contest whether government agencies are being forced to do anything. As the Court finds that IIRIRA § 402(a) does not apply to the President or the Council, this argument is irrelevant. Nonetheless, the Court believes that Defendants are correct in arguing that Plaintiffs do not have standing to argue the interests of federal government agencies.

(emphasis added).  Plaintiffs further assert that the fact that government contractors do not have to be government contractors has no bearing upon whether Executive Order 13,465 and the Final Rule require use of E-Verify.   Moreover, Plaintiffs debate whether current government contractors have any real choice not to use E-Verify by opting not to be a government contractor. For example, Plaintiffs maintain that the options for many government contractors are: (1) use E-Verify; or (2) go out of business.   Plaintiffs assert that this is not really a voluntary choice. Plaintiffs also argue that the Court should not rely upon *Kahn* because: (1) *Kahn* is not binding Fourth Circuit precedent; (2) *Kahn* was poorly reasoned and incorrect; (3) *Kahn* did not address a statutorily prohibited action; (4) *Kahn*'s holding on this issue was dicta; and (5) IIRIRA does not use the mandatory/voluntary dichotomy at issue in *Kahn*.

Defendants reply to Plaintiff's argument by arguing that *Kahn* is instructive and analogous.  Defendants assert that the fact that Kahn addressed the word "mandatory" while IIRIRA uses the word "require" is irrelevant.   Moreover, Defendants argue that *Kahn's* discussion of this issue was an alternative holding and, thus, was not dicta.

In *Kahn*, the President Carter issued an Executive Order that required government contractors to use certain wage-and-price standards.   Most of the *Kahn* decision addressed whether President Carter's Executive Order was consistent with the Procurement Act.   The D.C. Circuit found that it was.  *See Kahn*, 618 F.2d at 793.   A second issue addressed in *Kahn* was whether the Executive Order at issue was invalid and inconsistent with a provision of the Council for Wage and Price Stability Act ("COWPSA").   *Id.* at 794.   The relevant provision of COWPSA stated that "Nothing in this Act . . . authorizes the continuation, imposition, or reimposition of any mandatory economic controls with respect to prices, rents, wages . . . ."  *See id*.   The plaintiff in *Kahn* argued that President Carter's Executive Order violated COWPSA

because it established mandatory economic controls.   The D.C. Circuit disagreed and held that

President Carter established the mandatory wage standards pursuant to the Procurement Act not

COWPSA.  *Id.*  Thus, the D.C. Circuit found that the Executive Order did not violate COWPSA

because COWPSA merely stated that "Nothing in this Act . . . authorizes . . . mandatory

economic controls . . . ."  *Id.* at 795.[6]   In other words, the D.C. Circuit found that the

Procurement Act, not COWPSA, authorized the economic controls at issue.   As an alternative

holding, the D.C. Circuit found that no one has a right to be a government contractor, and thus,

the court did not think that the economic controls imposed by President Carter's Executive Order

were mandatory.  *Id.* at 794.  The Executive Order at issue in *Kahn* merely placed a provision in

a government contract, and the government contractor then had the voluntary option to contract

with the government.   The *Kahn* court did not believe this could be described as mandatory.[7]  *Id.*

　　　　*Kahn* was a six-judge majority decision of the en banc D.C. Circuit.   *Kahn* has been valid

law for 30 years, and it is one of, if not the only, decision that addresses whether an Executive

Order that adds a provision to a government contract places a mandatory obligation on a

government contractor.   Though *Kahn* is a D.C. Circuit case, the Fourth Circuit has discussed

parts of the *Kahn* decision in a favorable manner.   *See Liberty Mut. Ins. Co. v. Friedman*, 639

F.2d 164, 170-71 (4th Cir. 1981).   Moreover, the *Kahn* decision is factually similar to this case.

As such, the Court believes that *Kahn* is instructive and persuasive.

　　　　As held in *Kahn*, the Court agrees that the decision to be a government contractor is

voluntary and that no one has a right to be a government contractor.   Though Executive Order

13,465 and the Final Rule require government contracts to contain a clause regarding use of E-

---

[6] *Kahn's* holding and the similarity between the relevant portion of COWPSA and IIRIRA § 404(h) further bolters the Court's decision that IIRIRA § 404(h) does not prohibit Executive Order 13,465 or the Final Rule.

[7] The Court is not persuaded by Plaintiffs' argument that *Kahn* should be disregarded because it addressed the word "mandatory" while this case addresses the word "require."   One of the definitions of the word "mandatory" is "required by or as if by mandate."  *Webster's II New Riverside University Dictionary* 722 (1984).

Verify, potential government contractors have the option not to contract with the government. As such, the Court finds persuasive Defendants' argument that Executive Order 13,465 and the Final Rule do not require any person or entity to use E-Verify.

C.      **Count III - Executive Order 13,465 and the Final Rule Not Authorized by the Procurement Act**

Citing *Liberty Mutual*, Plaintiffs argue that Executive Order 13,465 and the Final Rule are not authorized by the Procurement Act because there does not exist a "manifest close nexus between the Procurement Act's criteria of efficiency and economy" and the Final Rule and Executive Order 13,465.   Plaintiffs assert that there is no record evidence supporting a relationship between the Procurement Act's goals of promoting efficiency and economy in government procurement and the requirements imposed by Executive Order 13,465 and the Final Rule, and Plaintiffs maintain that *Liberty Mutual* requires such record evidence.   Plaintiffs also argue that, even if no record evidence or factual findings are necessary, there is no close nexus between Executive Order 13,465 and the Final Rule, and the Procurement Act's goals because: (1) Executive Order 13,465 did not explain how E-Verify improves upon the Form I-9 process; and (2) Executive Order 13,465 did not explain how reverification of employees would promote efficiency, as current employees should already have been verified through the Form I-9 process.[8]

Defendants respond that the President does not have to base an Executive Order on factual findings, as the President is not a federal agency.   Defendants cite *American Federation of Government Employees v. Reagan*, 870 F.2d 723, 727-28 (D.C. Cir. 1989) for the proposition that a Presidential order is not required to set forth findings and is entitled to a presumption of regularity.   Regardless, Defendants assert that Presidents Clinton and Bush made findings that

---

[8] Defendants correctly point out that Plaintiffs never asserted these Form I-9 arguments in their briefs.

show that requiring government contractors to use an electronic employee eligibility system will promote economy and efficiency in procurement.  According to Defendants, these findings are logical and are sufficient under the Procurement Act.  In support of this argument, Defendants maintain that the President and the Council have broad discretion to regulate government contracting under the Procurement Act.  Defendants assert that federal courts typically defer to the President's findings regarding whether action required by Executive Order will promote efficiency and economy in procurement.  *See Kahn*, 618 F.2d at 789 (upholding President Carter's Executive Order requiring contractors to use certain wage-and-price standards); *see also City of Albuquerque v. United States Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004) (noting that the Procurement Act is a "broad delegation of authority" and upholding the Executive Order at issue); *UAW-Labor Employment & Trading Corp. v. Chao*, 325 F.3d 360, 366-67 (D.C. Cir. 2003) (finding a close nexus where the Executive Order at issue stated: "When workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced.  The availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts."); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) (noting the "broad authority" granted to the President by the Procurement Act).  Finally, Defendants assert that *Liberty Mutual* did not question the President's powers to place anti-discrimination requirements on government contractors pursuant to the Procurement Act but rather found that the plaintiff was not a government contractor.  *See Liberty Mut.*, 639 F.2d at 172.

The Court finds that Executive Order 13,465 and the Final Rule are consistent with the Procurement Act.  In Executive Order 13,465, President Bush explained how requiring

contractors to use E-Verify would promote efficiency and economy in procurement. Specifically, President Bush found that:

> Contractors that adopt rigorous employment eligibility confirmation policies are much less likely to face immigration enforcement actions, because they are less likely to employ unauthorized workers, and they are therefore generally more efficient and dependable procurement sources than contractors that do not employ the best available measures to verify the work eligibility of their workforce.

*See* Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 11, 2008).

There is no requirement, under *Liberty Mutual* or otherwise, for the President to base his findings on evidence included in a record. *Liberty Mutual* merely mentions that the President frequently refers to record evidence, but the case did not establish any requirement to do so. *See Liberty Mut.*, 639 F.2d at 170.

Two administrations have considered Executive Order 13,465 and the Final Rule, and both apparently believe that they promote efficiency and economy in procurement. The President and his Administration are in a better position than this Court to make such determinations. *Liberty Mutual* requires that there be a "reasonably close nexus" between the Executive Order and the Procurement Act's policy goals. *Id.* The Court understand this close nexus requirement to man little more than that President's explanation for how an Executive Order promotes efficiency and economy must be reasonable and rational. President's Bush explanation for Executive Order 13,465 meets that standard. The Court does not believe President Bush was required to explain how E-Verify improves upon the Form I-9 process. Were the Court to require more, it would be substituting its policy determinations and fact finding ability for that of the President. Given that courts have repeatedly noted that the President has broad discretion under the Procurement Act and have upheld Executive Orders

based on less rationale, the Court finds that Executive Order 13,465 and the Final Rule are consistent with the Procurement Act.

**D.      Count IV - The Reverification-of-Existing-Employees Requirement Imposed by Executive Order 13,465 and the Final Rule Exceeds E-Verify's Statutory Authority**

Plaintiffs argue that the statutory authority for E-Verify limits the use of the system to employment verification for new hires.  Thus, Plaintiffs argue that Executive Order 13,465 and the Final Rule's requirement that government contractors use E-Verify to reverify the employment eligibility status of current employees is impermissible under IIRIRA.  In support of this argument, Plaintiffs rely on the fact that IIRIRA only discusses using E-Verify for new hires. Plaintiffs also rely on several administrative brochures regarding the uses of E-Verify.  These brochures state that E-Verify should not be used to verify current employees.

Defendants argue that nothing in the text of IIRIRA prevents the use of E-Verify to confirm the employment eligibility of current employees.  Defendants assert that the fact that E-Verify is not currently used to verify current employees does not prevent the President from authorizing the use of E-Verify for that purpose.

In response, Plaintiffs assert that Congress is not required to "list every imaginable use of an experimental pilot program that Congress seeks to preclude."  Plaintiffs further argue that federal immigration law in general does not permit employers to reverify employment for current employees.

Nothing in IIRIRA explicitly prohibits the Executive Branch from using E-Verify for current employees.  Though there is administrative guidance saying that E-Verify should not be used for that purpose, that guidance does not legally prohibit the President from so requiring.  If

Congress intended it to be illegal to use E-Verify for current employees, then Congress should have made that clear under IIRIRA.  Thus, this Count fails.

E.     **Count V - Executive Order 13,465 and the Final Rule Are Legislative In Nature and Exceed the Executive Branch's Constitutional Authority**

Plaintiffs argue that the requirements imposed by Executive Order 13,465 and the Final Rule constitute lawmaking for which the Executive Branch lacks constitutional authority.  Thus, Plaintiffs argue that Executive Order 13,465 and the Final Rule are unconstitutional.

Defendants argue that Executive Order 13,465 and the Final Rule are authorized by the Procurement Act and are not legislative actions.  Defendants further argue that Congress has broad power to delegate authority to the Executive Branch.  In response, Plaintiffs maintain that they are not asserting a non-delegation violation.  Plaintiffs then reassert that the President's actions are impermissible under IIRIRA or the Procurement Act.  Plaintiffs also maintain that the President has no inherent power to require contractors to use E-Verify.

As Executive Order 13,465 and the Final Rule are permissible actions pursuant to the Procurement Act, this Count fails.  Plaintiffs have conceded that they are not asserting that the Procurement Act violates the non-delegation doctrine.

F.     **Count VI - Failure to Publish the Revised MOU in the Federal Register Violated the Office of Federal Procurement Policy Act**

The Office of Federal Procurement Policy Act ("Procurement Policy Act"), 41 U.S.C. § 401, *et seq.*, states that:

> [N]o procurement policy, regulation, procedure, or form (including amendments or modifications thereto) relating to the expenditure of appropriated funds that has (1) a significant effect beyond the internal operating procedures of the agency issuing the procurement policy, regulation, procedure or form, or (2) a significant cost or administrative impact on contractors or offerors, may take effect until 60 days after the procurement policy, regulation, procedure, or form is published for public comment in the Federal Register . . . .

41 U.S.C. § 418b(a).  The Procurement Policy Act further states that:

> Any notice of a proposed procurement policy, regulation, procedure, or form prepared for publication in the Federal Register shall include—(1) the text of the proposal or, if it is impracticable to publish the full text of the proposal, a summary of the proposal and a statement specifying the name, address, and telephone number of the officer or employee of the executive agency from whom the full text may be obtained; and (2) a request for interested parties to submit comments on the proposal and shall include the name and address of the officer or employee of the Government designated to receive such comments.

41 U.S.C. § 418b(c).  Under the act, "procurement" is defined as "all stages of the process of acquiring property or services . . . .  41 U.S.C. § 403(2).

Plaintiffs argue that Defendants' failure to publish the revised MOU in the Federal Register was a violation of the Procurement Policy Act.  In particular, Plaintiffs argue that the revised MOU was a "procurement policy, regulation, procedure, or form."  Plaintiffs point to the Procurement Policy Act's definition of acquisition, which includes "contract performance" and "management and measurement of contract performance through final delivery and payment." 41 U.S.C. § 403(16)(B).  Plaintiffs assert that the revised MOU relates to acquisition because failure to comply with the revised MOU can result in contract termination, suspension, or debarment.  Plaintiffs also argue that it was not impracticable to publish the full text of the MOU in the Federal Register.

Plaintiffs also assert that the Council violated the Procurement Policy Act because the Council did not actively solicit comments on the revised MOU but merely provided interested parties an opportunity to comment.  Finally, Plaintiffs note that a final version of the revised MOU was never made available for public inspection prior to the issuance of the Final Rule.

Defendants argue that Procurement Policy Act did not require the revised MOU to be published in the Federal Register because the revised MOU is not a "procurement policy, regulation, procedure, or form." Defendants assert that the revised MOU is not a "procurement

policy, regulation, procedure, or form" under the Procurement Act because the revised MOU does not address any step in the process of the government's acquisition of property or services. In support of this argument, Defendants relies on the fact that the MOU is executed between a contractor, the Department of Homeland Security, and the Social Security Administration, and addresses obligations regarding E-Verify and the duty not to discriminate, not issues regarding procurement.  Defendants also point out that the revised MOU was not drafted by the Council, and, thus, Defendants assert it would be unreasonable to require the Council to publish another agency's documents.

Defendants also argue that they did not violate the Procurement Policy Act because they published notice, though not the full text, of the revised MOU in the Federal Register and provided a link to the publicly available website where the full text of the MOU could be seen. Defendants assert that there is no need to publish materials that are otherwise publicly available. Defendants further assert that they received comments on the revised MOU.

The revised MOU addresses use of E-Verify and an employer's duty not to discriminate against potential employees, and the MOU is executed between the Department of Homeland Security, Social Security Administration, and the government contractor.  As such, the Court does not believe that the revised MOU can be described as addressing a "step in the process of the government's acquisition of property or services."  Quite simply, the revised MOU has nothing to do with the process of purchasing or acquiring anything.  Accordingly, Defendants did not have an obligation under the Procurement Policy Act to publish the full text of the revised MOU in the Federal Register.

Even if the Procurement Policy Act applies to the revised MOU, it is not clear that Defendants violated the law because Defendants' substantially complied with the Procurement

Policy Act.  In particular, Defendants made the revised MOU publicly available on the internet, published in the Federal Register a reference to the revise MOU and instructions as to where to find the revised MOU, and received comments on the revised MOU.  The Court believes that this type of compliance is sufficient.

Moreover, even if the Defendants violated the Procurement Policy Act, the appropriate remedy would be to stay the applicability date of the Final Rule pending publication of the revised MOU and a 60-day comment period.  The Court does not believe it would be appropriate to invalidate the entire Final Rule.  Were the Court to stay the Final Rule pending publication of the revised MOU and a 60-day waiting period, Plaintiffs would merely be granted the opportunity they have already had: to review and comment on the revised MOU.

### G.    Count VII - Violation of the Regulatory Flexibility Act

The Regulatory Flexibility Act requires a federal agency to prepare a final regulatory flexibility analysis when the agency promulgates a final rule after being required by law to publish a notice of proposed rulemaking.  5 U.S.C. § 604(a).  Among other things, the regulatory flexibility analysis must contain a "description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record."  *Id.*

In the Complaint, Plaintiffs argue that the Final Rule must be set aside because the Council failed to comply with the Regulatory Flexibility Act by "failing to account for the significant costs to employers who, although they have previously complied in good faith with all existing immigration laws, must replaces workers who become unauthorized to work solely by operation of the requirements imposed by Executive Order 13,465."

Citing *Ranchers Cattlemen Action Legal Fund v. United States Department of Agriculture*, 415 F.3d 1078, 1101 (9th Cir. 2005), Defendants argue that the proper inquiry is whether the agency made a reasonable, good faith effort to carry out the mandate of the Regulatory Flexibility Act.  Moreover, Defendants argue that the Regulatory Flexibility Act only requires an agency to consider the direct impacts that a regulation will have on an entity. Defendants assert that the Final Rule does not have the direct impact of causing employers to terminate unauthorized workers identified through the use of E-Verify.  Rather, Defendants maintain that any such terminations are the direct impact of the fact that the INA makes it illegal for employers to knowingly employee unauthorized workers.  Defendants also assert that it is "morally dubious" to argue that the cost of replacing illegal workers who should not have been hired in the first place is something the government must consider in passing a regulation.

In response, Plaintiffs assert that Defendants failed to consider the costs of incorrect results produced by E-Verify (i.e. instances where E-Verify produces a result that finds a person is unauthorized to work when the person is actually authorized to work).  Plaintiffs quote from a House Report that found that "nearly 1 in 10 naturalized citizens is reported by [E-Verify] as non-work authorized."  H.R. Rep. No. 111-157, at 131 (2009).  Plaintiffs also cite *Aeronautical Repair Station Ass'n, Inc. v. Federal Aviation Administration*, 494 F.3d 161, 178 (D.C. Cir. 2007) and argue that substantial compliance with the Regulatory Flexibility Act is insufficient.

In reply, Defendants point out that Plaintiffs have essentially abandoned the basis for this Count as pled in the Complaint.  Defendants claim that Plaintiffs now assert a different basis for their claim that the Regulatory Flexibility Act was violated.  Defendants assert, correctly, that the Final Rule did consider the costs that incorrect results produced by E-Verify could have on small businesses.  *See* 73 Fed. Reg. at 67,702.

It appears to the Court that Defendants complied with the Regulatory Flexibility Act, as the Final Rule contains a discussion of the regulatory flexibility analysis conducted by the Council.  In that regulatory flexibility analysis, Defendants considered the costs that incorrect results produced by E-Verify would have on small businesses.  Accordingly, Plaintiffs have failed to present a cogent argument as to how Defendants violated the Regulatory Flexibility Act.

Even if the Plaintiffs were correct, the proper remedy would not be to vacate the Rule promulgated by the agency.  Under *Aeronautical Repair Station*, if the Regulatory Flexibility Act was not followed, the proper remedy appears to be to remand to the agency and order that a regulatory flexibility analysis be prepared.  *See Aeronautical Repair Station*, 494 F.3d at 178. Here, remand is unnecessary because Plaintiffs have not shown a violation of the Regulatory Flexibility Act.

## V.    **CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' Cross Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.  A separate Order will follow.


    August 25, 2009                         /s/
        Date                               Alexander Williams, Jr.
                                       United States District Judge